IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 17-90-01 |
| MARK MANIGAULT | : | |

**MEMORANDUM**

**SURRICK, J.**  **JANUARY 30, 2020**

Presently before the Court are Defendant Mark Manigault's Motions to Suppress (ECF Nos. 28, 43, 46, 51, 72, 73). For the following reasons, Defendant's Motions will be denied.

## I. BACKGROUND

On February 16, 2017, a grand jury returned a one-count Indictment charging Defendant with being a convicted felon in possession of a firearm, specifically, a nine-millimeter semiautomatic handgun, a Taurus model PT 809, with serial number TC028448, in violation of 18 U.S.C. § 922(g)(1). (Indictment, ECF No. 4.) Defendant, who is proceeding *pro se* with court-appointed standby counsel, has filed more than twenty pretrial motions. With these Motions, Defendant seeks to suppress the 9mm Taurus handgun with which he was charged, and all other evidence, including videos taken of the crime, as fruit of the poisonous tree.

### A. Factual Background

The circumstances relevant to these Motions to Suppress are as follows. On the night of September 27, 2016, Philadelphia Police Officers Eugene Roher and Jeremy Olesik were working the 6:00 p.m. to 2:00 a.m. shift in a marked police vehicle in the area of the 5400 block of Osage Avenue. (Nov. 14, 2018 Hr'g Tr. 24-25, 110, ECF No. 106.) While on patrol, at approximately 11 p.m., the officers saw Defendant and Tamir Austin sitting on the steps outside

the front of a residence at 5407 Osage Avenue. (*Id.* at 25-26, 113.) At that time, Officers Roher and Olesik were partners assigned to the tactical squad of the 18th District. (*Id.* at 19, 21, 107.) As members of the tactical squad, the officers' duties included "address[ing] issues of concern in the area, such as robberies, shootings, [and] drug sales." (*Id.* at 19.) This entailed collecting intelligence on criminal activity and "becom[ing] familiar with the people in the area that [were] committing crime, [and] familiar with the locations that certain individuals associate together." (*Id.* at 19; *see also id.* at 106-07.) The Officers knew that Defendant and Austin did not live at 5407 Osage Avenue. (*Id*. at 113-114.)

The Officers testified that Defendant and Austin were both known to them as individuals associated with criminal activity who had previous contact with law enforcement. (*Id.* at 22-23, 107-10.) Officer Roher had encountered Defendant three to four times prior to the incident. (*Id*. at 108.) The last encounter involved Defendant being investigated for a shooting that happened in the area of 54th and Delancey Streets. (*Id*. at 108-09.) According to Officer Roher, Defendant had a "violent" reputation in the police department in September 2016. (*Id*. at 109.) Officer Roher also knew Austin because he had stopped him multiple times in the two years prior to this incident, one time during a pursuit involving Austin discarding a firearm. (*Id*. at 110.) Defendant was on the police officers' "offender list" because he had been arrested multiple times. (Nov. 15, 2018 Hr'g Tr. 31, ECF No. 107.) He was on the officers' radar the night of the incident. (*Id*.) Both Defendant and Austin are known illegally to carry guns. (*Id*. at 37; Roher Invest. Interview Rept., Gov. Ex. 3)[1]

---

[1] The Government and Defendant both submitted to the Court binders of exhibits that were admitted for purposes of the pretrial hearings. "Gov Ex. __" refers to the Government's exhibits and "Def. Ex. __" refers to the Defendant's exhibits. All exhibits are on file with the Court.

Officers Roher and Olesik were surprised to see Defendant and Austin sitting together because, based on the officers' experience, the two men were associated with two different groups that engaged in drug sales—Defendant with a group on Delancey Street, and Austin with a group on Irving Street. (Nov. 14 Hr'g Tr. 23, 26-27, 108-09, 113.) In addition, the officers knew that neither Defendant nor Austin lived on the 5400 block of Osage Avenue. (*Id.* at 90, 113.)

The officers drove past Defendant and Austin slowly and made eye contact with them. (*Id.* at 28; Nov. 15 Hr'g Tr. 20.) The officers then circled the block in their vehicle and, when they returned to the 5400 block of Osage Avenue two to three minutes later, Defendant and Austin were sitting on a stoop under the sign for the Katnip Bar, which is located on 54th Street near the intersection with Osage Avenue. (Nov. 14 Hr'g Tr. 28-29, 114-15.) The Katnip Bar is known to be a high crime area; it had recently been the scene for numerous shootings and murders. (*Id*. at 21-23.) The officers stopped their car, walked over to Defendant and Austin, and began speaking with them. (*Id*. at 29-30, 115.) Officer Roher shined a flashlight on Defendant and Austin as he approached. (Nov. 15 Hr'g Tr. 42-43.) Officer Olesik asked them what they were doing and if they had any weapons. (Nov. 14 Hr'g Tr. 51.) Defendant and Austin each lifted their shirts to reveal that they did not have any weapons in their waistbands. (*Id*. at 30, 51-52, 115.) Officer Olesik briefly returned to the police car and determined by a computer search that there were no active warrants for Defendant or Austin. (*Id.* at 30-31, 115.)

As Officer Olesik continued to talk with Defendant and Austin, Officer Roher walked back toward the location where the officers had first seen the two men and, using a flashlight,

3

looked under the wheel wells of vehicles parked on the street.[2] (*Id.* at 115.)  While doing so, Officer Roher saw the black handle of a handgun in the rear, passenger side wheel well of a black Mazda parked facing west on the north side of Osage Avenue.  (*Id.* at 31-32, 116, 119; Nov. 15 Hr'g Tr. 23.)  Upon finding the gun, Officer Roher notified Officer Olesik, and the officers placed Defendant and Austin in the back of their police car.  (Nov. 14 Hr'g Tr. 31-33, 116-17.)  Defendant and Austin were briefly frisked, but not handcuffed.  (*Id*. at 32-33.)  Both officers walked back to the car where Officer Roher had observed the black handle of a handgun.  (*Id.* at 34-35.)  Officer Roher shined his flashlight on the black Mazda's wheel well, and Officer Olesik also observed the black handle of a handgun.  (*Id.*)  Then the Officers continued walking, retracing the route Defendant and Austin had taken.  (*Id*.)  The officers then saw a second firearm in the front, passenger side wheel well of a different vehicle, a red Ford.  (*Id.* at 34-35, 47, 49, 117.)  Officer Roher testified that he believed there was one car parked between the black Mazda, where the first gun was located, and the red Ford, where the second gun was found.  (*Id.* at 117-18.)  He testified that both vehicles were approximately five to ten feet away from the location where the officers initially saw Defendant and Austin sitting together.  (*Id.* at 118.)  Officers Roher and Olesik did not remove either gun from the locations where they observed them.  (*Id.* at 69, 118.)

Officer Roher then went into the Katnip Bar and viewed the videotape from a security camera at the front exterior of the premises ("Katnip 1 Video").  (*Id.* at 33-34, 36, 118; Gov't Ex. 15.)  The officers testified that the Katnip 1 Video shows Austin and Defendant walking on Osage Avenue, and Austin placing an object under the rear, passenger side wheel well of the

---

[2] Officer Roher testified that, in his experience, individuals engaged in criminal activity commonly hide guns under vehicle wheel wells.  (Nov. 14 Hr'g Tr. 116.)

black Mazda. (Nov. 14 Hr'g Tr. 33-34, 36, 118-19.) Austin and Defendant then continued walking out of the view of the Katnip 1 Video. (*Id.* at 119.) After calling other police personnel to secure the scene, Officers Olesik and Roher handcuffed Defendant and Austin and transported them to the Southwest Detective Division for further investigation. (*Id.* at 38-39, 119-20.)

In the early morning hours of September 28, 2016, Detective Dennis Slobodian of the Southwest Detective Division arrived at the scene and recovered the two handguns and the Katnip 1 Video.[3] (11/15/2018 Hr'g Tr. 64, 67, 69, 74-75.) Detective Slobodian also recovered a second video ("Katnip 2 Video"), which depicts the corner of 54th Street and Osage Avenue in front of the Katnip Bar. (*Id.* at 79-80; Gov't Ex. 16.) The Katnip 2 Video shows Defendant and Austin walking by, then shows Officers Roher and Olesik exiting their vehicle and walking toward the two men, and later shows the officers walking Defendant and Austin to the officers' car. (11/15/2018 Hr'g Tr. 26-27.)

On September 29, 2016, Detective Michael Kimmel of the Southwest Detective Division recovered a third video from the night of September 27, 2019, which was obtained from a digital recorder at a private residence in the 5400 block of Osage Avenue (the "Residence Video"). (*Id.* at 123-26; Gov't Ex. 17.) Officer Roher testified that the Residence Video shows Defendant and Austin walking together, and Austin placing an object on the tire of the black Mazda where the officers located the first firearm. The video also shows Defendant placing an object in the front, passenger side wheel well of the red Ford where the second firearm was found. (11/15/2018 Hr'g Tr. 15-19.)

---

[3] The handgun recovered from the wheel well of the black Mazda was identified as a black Rossi 357 revolver. (11/15/2018 Hr'g Tr. 69.) The firearm recovered from the wheel well of the red Ford was identified as a nine-millimeter semiautomatic Taurus handgun, serial number TC028448. (*Id.* at 67-68, 70.)

Defendant and Austin were detained at the police station after their arrest in the early morning hours of September 28, 2016. A detainer was placed on Defendant by the Pennsylvania Board of Probation and Parole. (Supervision History, Def. Ex. 22.) On September 29th, the District Attorney's Office issued a Record of Declination, indicating that there was insufficient evidence against Defendant to support charges. (Record of Declination, Def. Ex. 13.) The Probation and Parole Board received the Record of Declination on September 30th, and removed the detainer. (Supervision History.) Defendant was released on the morning of December 30, 2016. (Custody Record, Def. Ex. 18.)

Austin remained in custody and ultimately entered a plea of guilty in the Court of Common Pleas of Philadelphia County to charges of firearms not to be carried without a license, possession of a prohibited firearm, and carrying firearms in public in Philadelphia. *See Commonwealth v. Austin*, No. CP-51-CR-0011022-2016 (Phila. Cty. Ct. Com. Pl.).

On October 5, 2016, Detective Slobodian secured an arrest warrant for Defendant. (Arrest Warrant, Gov. Ex. 5.) The Affidavit of Probable Cause states that, on September 29, 2016, Detective Kimmel recovered video surveillance from a private residence on 5400 Osage Avenue, which depicts Defendant placing an object on the wheel well of a parked Ford vehicle. (*Id*.) Defendant was arrested on October 7, 2016. (Feb. 1, 2019 Hr'g Tr. 23.) A preliminary hearing was held on December 1, 2016. (Def. Ex. 4.) Assistant District Attorney Laquan Lightfoot represented the Commonwealth at that hearing. (*Id*.; *see also* Feb. 1 Hr'g Tr. 19-20.)

### B. Procedural History

Defendant has filed over 20 motions in this case. Many of these motions are *pro se* motions. Others have been filed with the assistance of Court-appointed standby counsel. As a result, his trial has been continued on numerous occasions, many times as the result of additional

6

discovery requests by Defendant. The pretrial motions hearing in this case spanned seven days: November 14 through 16, 2018; January 30, 2019; February 1, 2019; February 8, 2019; and March 19, 2019. There were countless additional status hearings. Trial is scheduled to begin on January 31, 2020. The Court has indulged Defendant's countless requests for hearings, for additional evidence, for assistance in subpoenaing witnesses, and for the appointment of experts to assist in his case. Despite every opportunity provided, Defendant remains unable to demonstrate that his Constitutional rights were violated or that any misconduct occurred in this case that would justify suppressing evidence.

## II. DISCUSSION

Defendant seeks to suppress the 9mm Taurus handgun with which he was charged. He also seeks to suppress the video evidence recovered in this case.

### A. 9mm Taurus Handgun

Defendant argues that suppression of the Taurus handgun is justified because his Fourth Amendment rights were violated. Specifically, he contends that he was stopped and later detained by Officers Roher and Olesik without reasonable suspicion and that the Taurus handgun is a fruit of the unlawful detention. (ECF Nos. 28, 43, 46, 51, 73.) Defendant also argues that suppression of the Taurus handgun is warranted because the Government has failed to properly authenticate it under Rule 901 of the Federal Rules of Evidence. Specifically, he contends that there is a gap in the chain of custody of the firearm, inconsistencies as to who recovered the firearm, and proof of evidence tampering. (*See* ECF No. 43.)

#### 1. *Defendant's Fourth Amendment Rights were Not Violated*

The Fourth Amendment to the United States Constitution secures "persons, houses, papers, and effects, against unreasonable searches and seizures" by law-enforcement officers.

U.S. Const. amend. IV.  Defendant argues that he was seized in violation of the Fourth Amendment when Officers Roher and Olesik stopped to speak to him and Austin on the stoop of the Katnip Bar.  He contends that the officers lacked the requisite reasonable suspicion to stop and question them, and that the result was an unconstitutional seizure.  He contends that because the initial stop and seizure were unconstitutional, the subsequent search of the wheel well of the car was also unconstitutional since the "firearm was not discovered independent from the stop." (ECF 115 at 6.)  Defendant's argument has no support in the law.  Initially, Defendant lacks standing to contest the admissibility of the handgun.  However, even if he did have standing, Officers Roher and Olesik's questioning of Defendant and Austin did not encroach on Defendant's Fourth Amendment rights.

First, we address Defendant's standing to object to the admissibility of the 9mm Taurus handgun.  A defendant seeking to suppress evidence based on a violation of the Fourth Amendment must demonstrate that he has a reasonable expectation of privacy in the evidence.  *United States v. Correa*, 653 F.3d 187, 190 (3d Cir. 2011); *see also Minnesota v. Olson*, 495 U.S. 91, 95 (1990) ("[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." (quotation marks omitted)).  The defendant must also show that the reasonable expectation of privacy is one "that society recognizes as reasonable."  *Kyllo v. United States*, 533 U.S. 27, 33 (2001).

If a defendant abandons property, he loses a reasonable expectation of privacy in that property.  *Abel v. United States*, 362 U.S. 217, 241 (1960) (holding that discarded property in hotel trash can was abandoned and "[t]here can be nothing unlawful in the Government's appropriation of such abandoned property"); *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir.

8

2004) (holding that a reasonable expectation of privacy is forfeited when property is abandoned). Courts "determine from an objective viewpoint whether property has been abandoned." *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004). "Whether abandonment occurred is a question of intent which may be inferred from acts, words and 'other objective facts.'" *United States v. Ramos,* 12 F.3d 1019, 1022-23 (11th Cir. 1994). "Proof of intent to abandon property must be established by clear and unequivocal evidence." *Fulani,* 368 F.3d at 354.

The facts in this case support a finding that Defendant abandoned the 9mm Taurus handgun. The Residence Video shows Defendant placing an object in the front, passenger-side wheel well of the red Ford. The video also shows Defendant and Austin being approached by Officers Roher and Olesik. Officer Roher later discovered the 9mm Taurus handgun in the front, passenger-side wheel well of the red Ford. The red Ford did not belong to Defendant. Defendant does not have a reasonable expectation of privacy in public places, such as in the wheel well of someone else's car parked on a public street. *See United States v. Phillips*, 677 F. App'x 294, 296 (6th Cir. 2017) (holding that the defendant "gave up any legitimate expectation of privacy in his handgun when he dropped it in a public street and left it behind for the world to see"); *United States v. Kirlew*, 291 F. App'x 536, 538 (4th Cir. 2008) (holding that evidence seized from car abandoned by defendant in public street so he could run away from police officers was not an impermissible search under the Fourth Amendment because defendant abandoned the car); *United States v. Britton*, 335 F. App'x 571, 576 (6th Cir. 2009) ("Once the loaded handgun was dropped in a place where the defendant had no reasonable expectation of privacy, there is no sensible rule that would prevent the police officer from picking it up. '[T]he police cannot be reasonably expected to avert their eyes from evidence of criminal activity that

9

could have been observed by any member of the public.'" (quoting *California v. Greenwood*, 486 U.S. 35, 41 (1988))).

In this case, Defendant and Austin placed the firearms in wheel wells prior to being approached by Officers Roher and Olesik. Defendant cannot claim any constitutional violation when the handgun was abandoned prior to any alleged seizure. "When property is voluntarily abandoned *before* a seizure and retrieved by the police, it has been lawfully recovered and there can be no claim that it was the subject of an unconstitutional seizure." *United States v. Johnson*, 432 F. App'x 118, 120 (3d Cir. 2011) (emphasis added) (holding that defendant fleeing from police was never seized, so therefore his "voluntary decision to abandon the pistol was not the product of a Fourth Amendment violation and, therefore, was not fruit of the poisonous tree."); *see also United States v. Phillips*, 677 F. App'x 294, 295 (6th Cir. 2017) ("Thus, as the Supreme Court held long ago, when a fleeing suspect sheds evidence before being apprehended, as defendant did in this case, it is not the product of a 'seizure' and thus no violation of the Fourth Amendment to collect and use that evidence against him.").

In this case, the police officers' interactions with Defendant and Austin in front of the Katnip Bar did not violate Defendant's constitutional rights. Generally, a police officer may conduct a brief investigatory seizure under *Terry v. Ohio*, 392 U.S. 1 (1968), "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "However, this reasonable suspicion requirement is only triggered by a seizure, which occurs when an officer applies physical force or when a person submits to an officer's 'show of authority." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *Hodari D.*, 499 U.S. at 625)). In contrast to *Terry* stops, the Third Circuit has described consensual encounters, as follows:

> Consensual encounters. . . implicate no Fourth Amendment interest. They therefore need not be supported by reasonable suspicion or probable cause. Such voluntary interactions occur when an officer approaches an individual on the street or in another public place, and a reasonable person in that position would feel free to decline the officers' request or otherwise terminate the encounter.

*Id*. at 84. (internal citations and quotation marks omitted.)

Here, the initial encounter between Defendant and Austin and the police officers was consensual. Officers Roher and Olesik stopped their vehicle, approached Defendant and Austin in front of the Katnip Bar, and began speaking with them. Officer Roher shined his flashlight on Defendant and Austin. The police officers asked whether the men had weapons, and in response, Defendant and Austin lifted their shirts to reveal their waistbands. When the officers requested identifications, both men complied and provided them. Based on these facts, a reasonable person in Defendant or Austin's position would have been free to decline the officers' requests and terminate the encounter. "[M]ere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991) (holding that police officers are permitted to ask questions, ask for identification, and request consent to search luggage, so long as they "do not convey a message that compliance with their requests is required."); *see also United States v. De Castro*, 905 F.3d 676, 682 (3d Cir. 2018), cert. denied, 139 S. Ct. 1219 (2019) (concluding that police officer's request that defendant take his hands out of his pockets while walking towards him was not a seizure, but rather a consensual encounter). The police officers never stated to Defendant or Austin that they were not free to leave, or that compliance with their requests was required. The fact that Officer Roher was shining his flashlight on Defendant and Austin does not change the analysis. Police officers are permitted to take action to assure the safety of themselves and others. *De Castro*, 905 F.3d at 682.

11

A consensual encounter "loses its consensual nature" and a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Oliva-Ramos v. Attorney Gen. of U.S.*, 694 F.3d 259, 285 (3d Cir. 2012) (internal citation and quotation marks omitted). There is no dispute that, when the police officers placed Defendant and Austin in the police cruiser after discovering a handgun in a nearby wheel well, this show of authority rose to the level of seizure. However, the seizure at this point was proper because it was based on the police officers' reasonable suspicion that Defendant had committed or was about to commit a crime. The officers were aware of Defendant's and Austin's prior criminal behavior. Officer Roher had just discovered the firearm a very short distance from the Osage private residence where he originally observed Defendant and Austin. (Nov. 14 Hr'g Tr. 115-116.)

Whether a seizure occurred earlier in the encounter when Officer Olesik briefly returned to the police car with Defendant's identification card to determine whether there were active warrants for him, is a closer call. The question centers on whether a reasonable person in Defendant's position would have "felt free to leave" or "free to decline the officers' requests" when the officers request his identification to run it through the computer system. *Bostick*, 501 U.S. at 439. Based on the facts in the record, we are satisfied that Defendant's liberty was not restrained as a result of the police officers' actions. There was no physical force used. Officer Olesik requested to see identification; he did not demand it. The nature of the encounter up until that point had been conversational, and consensual. A seizure did not occur when Officer Olesik ran Defendant's identification through the computer system.

However, even if one were to conclude that it did constitute a seizure, the brief detention was for investigatory purposes and was based on the police officers' reasonable suspicion that

12

Defendant was committing or about to commit a crime. The police officers knew that both Defendant and Austin were known to carry guns illegally, and that Defendant had a reputation for being violent. In addition, the officers were suspicious when they observed Austin and Defendant—who were members of rival drug groups—conversing. Defendant and Austin were sitting on the steps of residence where they did not live and then walked to the Katnip Bar, which the police officers knew to be a high crime bar that had recently experienced shootings and murders. Based on the "totality of the circumstances," including consideration of the "experience and specialized training" of Officers Olesik and Roher, *see United States v. Arvizu*, 534 U.S. 266, 273-74 (2002), the police officers were justified in detaining Defendant and Austin to investigate further.

Moreover, when the police officers placed Defendant and Austin in handcuffs and in the back of their cruiser, at this point, probable cause existed for their detention and arrest. "Probable cause to arrest exists when the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, to believe . . . that the suspect has committed, is committing, or is about to commit an offense.'" *United States v. Jackson*, 682 F. App'x 86, 87 (3d Cir. 2017) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). The officers had discovered both firearms—one in the wheel well of the Ford and one in the wheel well of the Mazda, which was only five to ten feet away from the Ford. They also knew the Defendant and Austin had moved from loitering outside of the private residence on Osage Avenue to the location of the Katnip bar, and that guns were found in close proximity to the private residence. At this point, the officers had also viewed the video from the Katnip bar, which depicted Austin place an object on the wheel well of the Mazda. Moreover, the officers knew that Defendant and Austin were criminals who were known to carry illegal

13

firearms. A reasonable person in Officer Roher and Officer Olesik's position would believe that Defendant and Austin had been possession of illegal firearms.

Finally, we must note that even if some part of the police officers' stop, detention, or arrest of Defendant constituted a violation of Defendant's Fourth Amendment rights, the outcome would nevertheless be the same. Defendant abandoned the 9mm Taurus handgun on the wheel well pf the Ford prior to being approached by Officers Roher or Olesik. If abandonment of property occurs prior to any alleged misconduct, the defendant lacks a reasonable expectation in the abandoned property, *even if it is determined that the police acted improperly*. *See California v. Hodari D.*, 499 U.S. 621 n.1, 624 (1991) (holding that cocaine tossed by the defendant during a pursuit and immediately before a seizure constituted abandoned property even though the seizure was later found to be unjustified); *United States v. Martin*, 399 F.3d 750, 753 (6th Cir. 2005) (stating that if property is discarded before a seizure has occurred then the property is abandoned, regardless of whether the seizure constitutes police misconduct).

Defendant had no reasonable expectation of privacy in the wheel well of someone else's red Ford parked on a public Philadelphia street, where he abandoned the 9 mm Taurus handgun. As a result, Defendant lacks standing. His Motions to Suppress the handgun will be denied.

2.  *The Handgun has been Properly Authenticated under Rule 901*

Defendant also contends that the 9mm Taurus handgun should be suppressed because the Government has not properly authenticated the gun under Federal Rule of Evidence 901. Specifically, he contends that there is a gap in the chain of custody, there are inconsistencies on who recovered the firearm, and there is proof of evidence tampering. (ECF No. 43).

Physical evidence must be authenticated prior to it being admitted into evidence. Rule 901 of the Federal Rules of Evidence states that "[t]o satisfy the requirement of authenticating or

14

identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "One way to establish authentication is to show the chain of custody for the evidence." *United States v. Figueroa*, No. 08-38, 2010 WL 2136566, at *5 (E.D. Pa. May 25, 2010).

Defendant argues that the 9mm Taurus handgun should be suppressed because there is a gap in the chain of custody. The chain of custody form indicates that at 6:31 a.m. on September 28, 2019, the firearm was in the possession of the Evidence Intake Unit. (Def. Ex. 12.) Defendant argues that because the firearms were recovered a few hours earlier, there is an approximate four-hour gap where the guns are not accounted for. (ECF No. 43.) Defendant's argument does not support suppression. The Third Circuit has "long rejected the proposition that evidence may only be admitted if a "complete and exclusive" chain of custody is established. *United States v. Rawlins*, 606 F.3d 73, 82 (3d Cir. 2010). "Serious gaps may render a chain of custody so deficient that exclusion is required, but in the ordinary case, gaps in the chain go the weight of the evidence, not its admissibility." *Id*. at 82-83. Defendant has failed to present any evidence that there is a gap in the chain of custody that warrants finding the firearm has not been properly authenticated. Detective Slobodian testified that, after he recovered the firearm from the wheel well of the Ford at approximately 2:30 a.m. on September 28th, he submitted them to the Firearms Identification Unit of the Philadelphia Police Department, where the firearms were logged into evidence. (Nov. 15 Hr'g Tr. 80-81.) Detective Slobodian filled out a property receipt, in which he requested that the firearm be held for DNA and fingerprint analysis. (*Id*. 68-69; Gov. Ex. 6.)

Moreover, despite Defendant's contention, there are no inconsistencies in the record about who recovered the firearms from the scene of the crime. Detective Slobodian testified that

15

he recovered the firearms from the wheel wells of the Mazda and Ford at approximately 2:30 a.m. on the morning of September 28th. Defendant attempts to manufacture an inconsistency by pointing to the CAD report, which states that at approximately 11:10 p.m. on September 27th, Officers Roher and Olesik "recovered" the two firearms. (CAD Rept., Def. Ex. 6.) Detective Slobodian stated that, despite what the CAD report states, police officers do not "recover" or remove firearms from the scene of a crime; they only observe them. Instead, police department policy requires investigators to recover evidence from the scene of a crime. (Nov. 16, 2018 Hr'g Tr. 51-52.) Even if there were inconsistencies, this does not support a finding that the firearms could not be properly authenticated for use at trial.

Defendant also argues that the 9mm Taurus firearm should be suppressed because Detective Slobodian destroyed possible exculpatory evidence in bad faith. Specifically, he claims that the detective did not preserve the firearm in an appropriate container prior to submitting the firearm for fingerprint and DNA analysis. (ECF No. 46.) He relies on the chain of custody form, which he claims does not account for the time when Detective Slobodian was in possession of the firearms. (Chain of Custody, Def. Ex. 12.) Defendant's argument makes little sense. There is nothing in the record suggesting that Detective Slobodian, or any other law enforcement officer, destroyed evidence or failed to properly preserve evidence. In fact, Defendant had an opportunity to question Detective Slobodian about preserving the gun for fingerprint and DNA Analysis. Detective Slobodian testified that he has nothing to do with completing the chain of custody form, but that he specifically placed the guns in sealed plastic bags after he recovered them. (Nov. 15 Hr'g Tr. 91-92.)

Defendant has failed to demonstrate any issues with authentication of the firearms. His Motions to Suppress the firearms will therefore be denied.

### C. Suppression of Videos

Defendant also raises arguments in support of suppressing the video evidence in this case: the Katnip 1 Video; the Katnip 2 Video; and the Residence Video. Defendant argues that the videos should be suppressed as fruit of the poisonous tree from his illegal stop and detention. (ECF Nos. 28, 43, 46, 51, 73.) Defendant also argues that his due process rights were violated while in state custody for three days after his initial arrest. (ECF Nos. 72, 152.)[4]

#### 1. *Fruit of Poisonous Tree and Standing*

The video evidence in this case does not constitute fruit of the poisonous tree because Defendant's Fourth Amendment rights were not violated by Officers Roher and Olesik. *See Rakas v. Illinois*, 439 U.S. 128, 134 (1978) ("[I]t is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the [exclusionary rule's] protections."). In any event, Defendant has no reasonable expectation of privacy in the video evidence and therefore lacks standing to object to this admissibility. Both the Katnip Videos and the Residence Video recorded public areas, specifically Osage Avenue. It recorded Defendant's actions on a public street. S*ee Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."); *Kowalski v. Scott*, 126 F. App'x 558, 559-60 (3d Cir. 2005) (holding that private investigator's video surveillance of defendant was conducted in public places and therefore the defendant lacked a reasonable expectation of privacy in the video). Defendant's Motions to Suppress the video evidence based on Fourth Amendment violations will be denied.

---

[4] Defendant also argues that no consent forms were obtained from the Katnip bar. Detective Slobodian testified that consent forms are not required for video evidence. In any event, both Officer Roher and Detective Slobodian received oral consent from employees of the Katnip Bar to view the videotape recorded by the Katnip security cameras.

## 2. *Defendant's Due Process Rights were Not Violated*

Defendant also argues that due process violations that he endured while in state custody following his arrest on September 27, 2016, warrant suppression of the video evidence. (ECF Nos. 72, 152.)[5] He contends that his three-day detention was illegal because he was never formally arrested, nor did he appear for a preliminary arraignment hearing.[6] Defendant contends that his state procedural rights were violated, specifically Rule 519 of the Pennsylvania Rules of Criminal Procedure.[7] Rule 519 states that "when a defendant has been arrested without a warrant in a court case, a complaint shall be filed against the defendant and the defendant shall be afforded a preliminary arraignment by the proper issuing authority without unnecessary delay." Pa. R. Crim. P. 519. Defendant's argument ignores the fact that the State Parole Board lodged a detainer on him, requiring he remain in state custody. In addition, the police were waiting to hear whether charges were approved from the District Attorney's Office. As soon as the police officers received notice that the District Attorney was declining charges, the detainer

---

[5] Defendant requests that the Court dismiss the Indictment, or in the alternative to suppress the evidence as a result of his alleged due process violations. Because the Court finds that Defendant's constitutional rights were not violated when he was in state custody following his arrest, Defendant's request to dismiss the Indictment, or in the alternative, to suppress the video evidence, will be denied.

[6] Defendant also alleges somewhat of a conspiracy theory about his state custody detention. He alleges that, prior to his release, the police recovered the video surveillance implicating him in the crime and the Assistant District Attorney approved charges, but that the police nevertheless permitted his release. Defendant alleges that this demonstrates an "illegal use of detention" and shows attempts by police to "cover up misconduct." (ECF No. 152.) Nothing in the record demonstrates any misconduct by any of the police officers in this case. Defendant has failed to show that the timing of his release or "procedural irregularities" violated his Constitutional rights, let alone justify suppressing video evidence.

[7] Defendant also refers to Rule 502, which addresses how to initiate criminal proceedings in court cases, and Rule 540, which discusses specific rules associated with the preliminary arraignment. Defendant has offered no explanation as to how these Rules apply or how they have been violated.

18

was lifted, and Defendant was released. There was no formal complaint charged against him. Defendant has failed to offer any authority showing that his time in state custody and subsequent release violated his due process rights.

Moreover, even if Defendant were able to show a due process violation, this would not require suppression of the video evidence in this case. Although a delay between arrest and arraignment does not necessarily constitute a constitutional violation, it can support a due process violation if the delay results in a coerced confession. *See Turner v. Pennsylvania,* 338 U.S. 62, 65-66 (1949); *United States ex rel. Hayward v. Johnson,* 508 F.2d 322, 330 (3d Cir.) ("While an unduly long delay between arrest and arraignment may give rise to a constitutional claim, it may do so not because of a violation of a procedural rule, but because the undue delay may support a finding that the confession was coerced."); *Sklar v. Ryan*, 752 F. Supp. 1252, 1264 (E.D. Pa. 1990) ("An undue delay between arrest and arraignment only gives rise to a constitutional claim when the delay results in a confession that was coerced."). Defendant has offered no authority, and we are aware of none, that supports a finding that suppression of video evidence recovered during a criminal investigation is required if a defendant experiences a delay in appearing for a preliminary arraignment. Defendant's Motions to Suppress the video evidence in this case will be denied.[8]

---

[8] Defendant seeks to exclude the Residence video, alleging that the police officers tampered with the recording. (ECF No 163.) This Motion will be addressed by a separate Order.

**III.    CONCLUSION**

For the foregoing reasons, Defendant's Motions to Suppress will be denied.

An appropriate order follows.

> **BY THE COURT:**
>
> _____
> **R. BARCLAY SURRICK, J.**